01
02
03
04
05
06
07
08
09
10
11
12
13

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| STEVEN J. HEADLEY, et al., | ) | Case No. C07-717-JPD |
| | ) | |
| Plaintiffs, | ) | |
| | ) | ORDER DENYING DEFENDANT'S |
| v. | ) | MOTION TO STRIKE AND GRANTING |
| | ) | IN PART AND DENYING IN PART |
| FERRO CORPORATION, | ) | DEFENDANT'S MOTION FOR |
| | ) | SUMMARY JUDGMENT |
| Defendant. | ) | |
| | ) | |

## I.   INTRODUCTION AND SUMMARY CONCLUSION

The present matter comes before the Court on defendant Ferro Corporation's Motion for Summary Judgment and Motion to Strike. Dkt. Nos. 62, 66. Plaintiffs Steven and Susan Headley ("Plaintiffs") have filed a brief opposing these motions, Dkt. Nos. 75 and 88, to which Ferro has replied. Dkt. No. 80. Oral argument in this matter was held on May 19, 2008. After careful consideration of the motions, responses, governing law and the balance of the record, the Court ORDERS that defendant's Motion to Strike be DENIED and defendant's Motion for Summary Judgment be GRANTED IN PART AND DENIED IN PART.

## II.   FACTS AND PROCEDURAL HISTORY

This is a personal injury case. Plaintiff Steven Headley ("Mr. Headley") has sued Ferro Corporation  ("defendant" or "Ferro") for damages he suffered as a result of his exposure to silica or silica-containing dry enamel products during the course of his employment at A.O. Smith Corporation from 1976 to 2005 as a sprayer in the manufacture of water heaters. A.O.

SUMMARY JUDGMENT ORDER
PAGE – 1

01  Smith is a corporation that manufactures, sells, and supplies boiler tanks and other products.

02  Plaintiff worked at A.O. Smith's Seattle plant from 1976 to 1993, and thereafter at the Renton

03  plant.  His job consisted of manually spraying the inside of water heaters with a substance known

04  as "frit," a vitreous material used in making porcelain, glazes, or enamels.   Frit is the base

05  ingredient of the product at issue that was manufactured and sold by Ferro in this case (Product

06  Number 2772-2).

07      Plaintiffs allege that Mr. Headley was exposed to high amounts of silica when mixing,

08  spraying, sanding and cleaning Ferro's product during his employment at A.O. Smith and is now

09  disabled and suffers from silicosis as a result.  *See* Dkt. No. 2 at 7; *see also* Dkt. No. 81, Ex. 9 at 3

10  (Firestone Report) (diagnosing "classic" silicosis), *and* Dkt. No. 76 at 3 & Ex. 1 at 3, 7 (Dr. Smith

11  Decl. and Report) (diagnosing slowly progressive complicated silicosis).[1]  Plaintiffs allege that A.O.

12  Smith purchased the silica-containing dry enamel product from defendant Ferro Corporation during

13  the period in question to make the enamel mixture that was sprayed on the interior of water heaters

14  during Mr. Headley's employment.[2]   Damages are sought for the time period Ferro sold the frit to

15  National Steel/A.O. Smith, which the parties agree was between the years of 1976 and 1993.  Dkt.

16  No. 2 at 5.  Because nonparty A.O. Smith has already compensated plaintiff through the worker's

17  compensation system, Ferro is the sole named defendant in this case.  *See* R.C.W. §§ 51.04 *et seq.*,

18  4.22.070(1).

19      The plaintiffs have made claims against Ferro for negligence, willful or wanton

20  

21      [1] Silicosis is a progressive and incurable disease of the lungs caused by the prolonged

22  inhalation of small respirable particles of crystalline silica.  Dkt. No. 67, Ex. 18 at 245 (Dr.
    Roberts Report).  "Silicosis is similar to asbestosis and asbestos-related injuries."   *Riverwood*

23  *Intern. Corp. v. Employers Ins. of Wausau*, 420 F.3d 378, 384 (5th Cir. 2005) ("Courts have not
    found any meaningful difference between silicosis and asbestosis that would merit distinction for

24  present purposes between the two.").

25      [2] A.O. Smith purchased Mr. Headley's initial employer, National Steel, in 1977 and

26  operated it at the Seattle location until 1996 or 1997, when the operation moved to Renton.  After
    purchase by A.O. Smith and the subsequent move, Mr. Headley's job remained the same—he
    continued to work as a porcelain enamel sprayer.  Dkt. No. 63, Ex. 3.

SUMMARY JUDGMENT ORDER
PAGE – 2

01 misconduct, product liability, product misrepresentation, breach of warranty, market share

02 liability and/or market share alternate liability, and enterprise liability.  Ferro has moved for

03 summary judgment on all claims.

04 ### III.  JURISDICTION

05   This action was removed pursuant to 28 U.S.C. § 1441.  Pursuant to 28 U.S.C. §

06 636(c), the parties have consented to having this matter heard by the undersigned Magistrate

07 Judge.  Subject matter jurisdiction exists under 28 U.S.C. § 1332.  The Court has general and

08 specific personal jurisdiction over Ferro because it conducted substantial business in this

09 jurisdiction or otherwise purposely availed itself of the benefits and protections of the forum

10 state, and the alleged cause of action arose out of its forum-related activities.  Venue is proper

11 under 28 U.S.C. § 1391(b).

12 ### IV.  CHOICE OF LAW

13   Under the *Erie* Doctrine, a federal court sitting in diversity applies federal procedural

14 law and the substantive law of the forum state—here, the State of Washington.  *Erie R.R. Co.*

15 *v. Tompkins*, 304 U.S. 64, 78 (1938); *Freund v. Nycomed Amersham*, 347 F.3d 752, 761 (9th

16 Cir. 2003).  Should the Court be faced with a legal question unaddressed by the forum state's

17 judiciary, it must predict how the Washington Supreme Court "would probably rule in a similar

18 case." *King v. Order of United Commercial Travelers*, 333 U.S. 153, 161 (1948).

19 ### V.  SUMMARY JUDGMENT STANDARD

20   "Claims lacking merit may be dealt with through summary judgment" under Rule 56 of

21 the Federal Rules of Civil Procedure.  *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002).

22 Summary judgment "shall be entered forthwith if the pleadings, depositions, answers to

23 interrogatories, and admissions on file, together with the affidavits, if any, show that there is no

24 genuine issue as to any material fact and that the moving party is entitled to a judgment as a

25 matter of law."  Fed. R. Civ. P. 56(c).  An issue of fact is "genuine" if it constitutes evidence

26 with which "a reasonable jury could return a verdict for the nonmoving party." *Anderson v.*

SUMMARY JUDGMENT ORDER
PAGE – 3

01 *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  That genuine issue of fact is "material" if it

02 "might effect the outcome of the suit under the governing law." *Id.*

03       When applying these standards, the Court must view the evidence and draw reasonable

04 inferences therefrom in the light most favorable to the nonmoving party.  *United States v.*

05 *Johnson Controls, Inc.*, 457 F.3d 1009, 1013 (9th Cir. 2006).  The moving party can carry its

06 initial burden by producing affirmative evidence that negates an essential element of the

07 nonmovant's case or by establishing that the nonmovant lacks the quantum of evidence needed

08 to satisfy its burden of persuasion at trial.  *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos.,*

09 *Inc.*, 210 F.3d 1099, 1102 (9th Cir. 2000).

10       Once this has occurred, the procedural burden shifts to the party opposing summary

11 judgment, who must go beyond the pleadings and affirmatively establish a genuine issue on the

12 merits of the case.  Fed. R. Civ. P. 56(e).  The nonmovant must do more than simply deny the

13 veracity of everything offered or show a mere "metaphysical doubt as to the material facts."

14 *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The mere

15 existence of a scintilla of evidence is likewise insufficient to create a genuine factual dispute.

16 *Anderson*, 477 U.S. at 252.  To avoid summary judgment, the nonmoving party must, in the

17 words of the Rule, "set forth specific facts showing that there is a genuine issue for trial." Fed.

18 R. Civ. P. 56(e).   The nonmoving party's failure of proof "renders all other facts immaterial,"

19 creating no genuine issue of fact and thereby entitling the moving party to the summary

20 judgment it sought.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

21                                    VI.   DISCUSSION

22       A.     Defendant's Motion to Strike

23       Expert reports were due in this case by March 25, 2008.  *See* Dkt. No. 59 (also

24 allowing plaintiffs opportunity to amend expert reports beyond such date).  According to the

25 defendant, plaintiffs did not identify Dr. Dorsett Smith as an expert until April 22, 2008, "when

26 they submitted the Smith Declaration in opposition to Ferro's motion for summary judgment."

01  Dkt. No. 80 at 9-10.  Defendant argues that for at least two reasons, Fed. R. Civ. P. 37

02  mandates exclusion of Dr. Smith's declaration.  *See* Dkt. No. 78 (Smith Decl.).  First,

03  defendant asserts that the declaration was untimely and insists that plaintiffs have provided the

04  Court with no reason, much less "substantial justification," for its late disclosure of Dr. Smith's

05  declaration.  *See* Fed. R. Civ. P. 37(c)(1) ("If a party fails to provide information or identify a

06  witness as required by Rule 26(a) or (e), the party is not allowed to use that information or

07  witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was

08  substantially justified or is harmless.").  Second, defendant argues that Dr. Smith's declaration

09  should be stricken because plaintiffs failed to accompany his testimony with an expert report as

10  required by Rule 26(a).  This rule provides that expert disclosures "must be accompanied by a

11  written report . . . *if the witness is one retained or specially employed to provide expert*

12  *testimony in the case or one whose duties as the party's employee regularly involve giving*

13  *expert testimony*."  Fed. R. Civ. P. 26(a)(2)(B) (emphasis added).

14          The Court concludes that both of defendant's rationales fail to disqualify the

15  declaration of Dr. Smith.  First, plaintiffs' identification of Dr. Smith was neither untimely nor

16  a surprise under Rule 37.  On July 2, 2007—a mere two months after plaintiffs' case was

17  removed to this court—plaintiffs identified the name and address of Dr. Smith in their initial

18  disclosures as a person who had "treated Mr. Headley with respect to his silicosis or following

19  his development of silicosis" and could provide relevant discoverable information.  Dkt. No.

20  83, Ex. 1 at 2-3, ¶ 5.  On the same date, plaintiffs submitted Dr. Laura Perry's Medical

21  Records related to Mr. Headley, which included Dr. Smith's report concerning Mr. Headley's

22  silicosis.  *See id.* Ex. 2.  Indeed, defendant submitted this report to its *own* experts for their

23  consideration in January 2008.  *See id.* Exs. 3-4.  Furthermore, plaintiffs provided additional

24  timely disclosure regarding Dr. Smith in their expert disclosures of March 10, 2008.  *See id.*

25  Ex. 5 (informing defendant that treating physicians such as Dr. Smith "may be called as

26  witnesses.  Their testimony may include expert opinions as they relate to causation and/or

SUMMARY JUDGMENT ORDER
PAGE – 5

01  prognosis.  Plaintiffs don't believe that they must include reports by Mr. Headley's treating

02  physicians other than medical records, which have already been provided.").  Accordingly,

03  defendant's untimeliness argument is not entirely accurate and its claim of surprise is not

04  supported by the record.[3]

05      Second, the Court disagrees with argument advanced by the defendant that expert

06  reports are always required before a physician can express opinions as to causation, diagnosis,

07  prognosis and the like.  Dkt. No. 80 at 9-12.  This appears to be the minority view.  *See*

08  *Sprague v. Liberty Mut. Ins. Co.*, 177 F.R.D. 78, 81 (D.N.H. 1998) ("The majority of other

09  courts in the country have concluded that Rule 26(a)(2)(B) reports are not required as a

10  prerequisite to a treating physician expressing opinions as to causation, diagnosis, prognosis

11  and extent of disability where they are based on the treatment.") (collecting cases).  The

12  majority view recognizes that a treating or examining physician "may form an opinion about

13  causation as a necessary part of the treatment rather than at the request of counsel, and the

14  purposes of Rule 26 may be satisfied without a formal report."  *Krischel v. Hennessy*, 533 F.

15  Supp. 2d 790, 795 (N.D. Ill. 2008) (citing *Fielden v. CSX Transp. Inc.*, 482 F.3d 866, 870-71

16  (6th Cir. 2007) (holding that a formal report is not required when determining causation is an

17  integral part of treating a patient)); *see also Watson v. United States*, 485 F.3d 1100, 1107

18  (10th Cir. 2007).

19      This view also comports with Congress's intentions in crafting the expert report

20  requirement of Rule 26(a)(2)(B), which represents an attempt to balance "the fulsome and

21  efficient disclosure of expert opinions" with a concern that reports should not be required in all

22  situations.  *Watson*, 485 F.3d at 1007.  The specific purpose of the requirement to exchange

23  expert reports is to eliminate unfair surprise to the opposing party and to conserve resources.

24

25

26      [3] Even assuming, for the sake of argument, that plaintiffs' disclosure of Dr. Smith was belated under Rule 37, the foregoing facts establish that such disclosure was harmless due to defendant's knowledge of Dr. Smith.  *See also infra*, n.4.

SUMMARY JUDGMENT ORDER
PAGE – 6

01   *See, e.g.*, *Minn. Mining & Mfg. Co. v. Signtech USA, Ltd.*, 177 F.R.D. 459, 460 (D. Minn.

02   1998) (citation omitted).

03          Here, Dr. Smith's declaration closely tracks the opinions set forth in his April 2005

04   report and are not based on information other than that which he gained in preparing that

05   report over two years prior to the litigation in this case.  *Compare* Dkt. No. 76 at 2-3, ¶¶ 3-6

06   (Smith Decl. of April 2008), *with id.* Ex. 1 at 7, ¶¶ 1-7 (Smith Report of April 2005).  Dr.

07   Smith's declaration does not venture far beyond what he observed and concluded in 2005 and

08   why he did so, does not go beyond his personal involvement in the facts predating this case,

09   and does not constitute an opinion formed *because of* this lawsuit.  *Krischel*, 533 F. Supp. 2d

10   at 795 (noting that a doctor "who testifies about his observation, diagnosis and treatment of a

11   patient is testifying about what he saw and did and why he did it, even though the physician's

12   treatment and his testimony . . . are based on his specialized knowledge and training.  [W]hen

13   the treating physician's testimony is so limited . . . there is no need for a Rule 26(a)(2)(B)

14   report.") (citing *Musser v. Gentiva Health Servs.*, 356 F.3d 751, 757 (7th Cir. 2004) (internal

15   punctuation omitted)).  To that end, while Dr. Smith's specific discussion of the latency period

16   is not discussed in the earlier report, his 2005 conclusion that Mr. Headley suffered from

17   "complicated" silicosis provides a sufficient link, for the present purposes, to Dr. Smith's 2008

18   latency details and counsel against the wholesale rejection of his 2008 declaration.[4]

19   Furthermore, as noted above, this declaration could not have surprised the defendant, who was

20   free to notice and take the deposition of Dr. Smith prior to the filing of dispositive motions if

21   defendant believed that Dr. Smith's testimony would produce information both unfair and

22   prejudicial.

23

24

25   ───────────────────

26          [4]  In addition, the plaintiffs have submitted the expert opinions of Dr. Jordan A. Firestone,
     who also discussed latency periods of silicosis, thus the defendant can hardly claim surprise
     about latency testimony.  *See* Dkt. No. 79, Ex. 3 (Firestone Dep.).

SUMMARY JUDGMENT ORDER
PAGE – 7

01    Under these circumstances, Dr. Smith's declaration falls outside of the disclosure

02 requirements of Rule 26(a)(2)(B), and will be considered by the Court in ruling on defendant's

03 motion for summary judgment.  Defendant's Motion to Strike is therefore denied.

04    B.    <u>Defendant's Motion for Summary Judgment</u>

05    Ferro requests that summary judgment be granted forthwith on each of plaintiffs'

06 claims because (1) there is no evidence that Mr. Headley was ever "overexposed" to any

07 respirable crystalline silica particles from a Ferro product; (2) even assuming such

08 overexposure occurred, plaintiffs cannot show that the overexposure was a "substantial factor"

09 in causing Mr. Headley's alleged disease; and (3) any alleged failure to warn on Ferro's part

10 was not a proximate cause of plaintiffs' damages.  Ferro further contends, in a footnote, that

11 because no evidence exists regarding any unreasonably safe product design, misrepresentation

12 or breach of warranty by Ferro, summary judgment should be entered on those claims as well.

13

14    1.    *Summary Judgment is Not Proper on the Issues of Exposure*
            *and Substantial Factor*

15    Ferro claims that because there is no direct evidence that Mr. Headley was ever

16 "overexposed" to any respirable crystalline silica particles from a Ferro product, summary

17 judgment should be granted for Ferro on plaintiffs' negligence claims. Dkt. No. 62 at 2, 11-14

18 (citing *Lockwood v. AC&S, Inc.*, 109 Wash.2d 235, 245, 744 P.2d 605 (1987) (negligence and

19 strict liability lawsuit brought by a plaintiff who developed asbestosis after working over forty

20 years at various Seattle shipyards)).

21    This, however, is not the law.  The word "overexposure" appears nowhere in the

22 *Lockwood* decision.  In that case, the Washington Supreme Court determined that some

23 evidence of  "exposure," not overexposure, was necessary to establish a finding of proximate

24 causation.  *Lockwood*, 109 Wash.2d at 237-38, 744 P.2d at 607-08.  For purposes of

25 proximate causation, the court did not require that the exposure, or inference of exposure, to

26 the defendant's asbestos-containing product must exceed any threshold limit value ("TLV") or

SUMMARY JUDGMENT ORDER
PAGE – 8

01  permissible exposure limit ("PEL"), as Ferro suggests for this case.  *See* Dkt. No. 66 at 12-14.

02  Indeed, the *Lockwood* court determined that a reasonable jury could find causation in the case

03  even though there was no direct evidence that the plaintiff worked directly with the asbestos

04  product at issue, unlike the facts that plainly exist regarding Mr. Headley here.  *Lockwood*, 109

05  Wash.2d at 247, 744 P.2d at 612-13 ("[E]ven if [plainitff] did not work directly with

06  [defendant's asbestos] product on the *George Washington*, it is reasonable to infer that since

07  that product was used on that ship when [plaintiff] worked there, [plaintiff] was exposed to

08  it.").  When this evidence was combined with Mr. Lockwood's expert's testimony that "all

09  exposure to asbestos has a cumulative effect in contributing to the contraction of asbestosis,"

10  the court considered it "reasonable for the jury to conclude that the plaintiff's exposure to

11  [defendant's] product was a proximate cause of his injury."  *Id.*

12          If such evidence was sufficient for *a finding* of proximate causation in *Lockwood*, then

13  clearly plaintiffs' evidence is sufficient to create a genuine issue of material fact on causation

14  here.  The parties do not dispute that the Ferro product in question (containing approximately

15  10% crystalline silica) was sold to A.O. Smith and used routinely by Mr. Headley while mixing

16  and spraying the enamel mixture in a water heater tank coating area from at least 1976 to

17  1993.  *See, e.g.*, Dkt. No. 66 at 6 n.5 (defendant's brief); *see also id.* at 8 (noting that such

18  exposure, *inter alia*, continued "during the entire length of [Mr. Headley's] employment at

19  A.O. Smith.").  This spraying was commonly performed in small makeshift spray booths or

20  inside larger tanks Mr. Headley would have to climb inside of to spray.  Dkt. No. 76, Ex. 1 at

21  2 (Dr. Smith Report).  There also appears to be no dispute, or at minimum an issue of material

22  fact, that Mr. Headley was subject to "rebound particles" of crystalline silica—or particles that

23  struck the tank surface but did not adhere—created through the use of Ferro's product when

24  Mr. Headley sanded the sprayed tank vessels and cleaned his work areas.  *See, e.g.*, Dkt. No.

25  77 at 2-3, ¶ 4 (Dr. Rose Decl.).  Finally, the report and declaration of Dr. Smith establishes

26  that Mr. Headley's silicosis was caused by the cumulative effect of all his exposure to

SUMMARY JUDGMENT ORDER
PAGE – 9

01  crystalline silica during the twenty-year latency period.  *See* Dkt. No. 76 at 2-3, ¶¶ 3-6 (Smith

02  Decl. of April 2008), *and id.* Ex. 1 at 7, ¶¶ 1-7 (Smith Report of April 2005); *see also* Dkt.

03  No. 79, Ex. 3 at 70-71 (Firestone Dep.) (similar).  A strikingly similar expert opinion on the

04  cumulative effect of a manufacturer's asbestos product resulted in a prima facie case of

05  proximate causation against the manufacturer in *Lockwood.  See Lockwood*, 109 Wash.2d at

06  247-248, 744 P.2d at 613.

07          Such evidence, when coupled with the conclusions by plaintiffs' additional experts, also

08  establishes a genuine issue of material fact that Mr. Headley's exposure to Ferro's crystalline

09  silica-containing product constituted a "substantial factor" in causing his silicosis.  *See*

10  *Mavroudis v. Pittsburgh-Corning Corp.*, 86 Wash.App. 22, 30, 935 P.2d 684, 688 (1997)

11  (holding that when multiple asbestos products exists as potential causes of asbestosis, a

12  plaintiff can prevail by showing "that the defendant's product was a substantial factor in

13  bringing about the injury").[5]

14          In an attempt to avoid this conclusion, Ferro makes two broad arguments:  (1) that any

15  exposure Mr. Headley may have had to a Ferro product "would not rise to the level of a

16  'substantial factor' . . . when it is clear that Headley was also exposed to silica-containing

17  products manufactured by A.O. Smith (VS 261) and other companies during [the relevant

18  period]"; and (2) because no industrial hygiene surveys were conducted at A.O. Smith from

19

20

21

22
_____

23          [5]  The "substantial factor" test for causation is used when an asbestos or similarly situated
        plaintiff is unable to show that one event alone was a cause of the injury.  *Mavroudis*, 86

24      Wash.App. at 30, 935 P.2d at 688.  In such a circumstance, the plaintiff does not have to prove
        or apportion individual causal responsibility.  *See Hue v. Farmboy Spray Co., Inc.*, 127 Wash.2d

25      67, 91, 896 P.2d 682, 695 (1995).  Instead, he or she need only establish that the defendant's
        product was among other sources of exposure in the plaintiff's environment that cumulatively

26      caused the disease.  *Lockwood*, 109 Wash.2d at 245-47, 744 P.2d at 610-12.

SUMMARY JUDGMENT ORDER
PAGE – 10

01  1976 through 1993, no plaintiff could ever establish exposure to Ferro's product amounting to

02  a substantial factor.  Dkt. No. 66 at 7, 15-16.[6]

03          Both contentions fail.  The first argument underscores exactly the kind of situation that

04  calls for application of the substantial factor test, in order that no supplier enjoy a proximate

05  causation defense on the ground that Mr. Headley likely would have suffered the same disease

06  from inhaling crystalline silica originating from the products of other suppliers during the

07  relevant time period.  *See Mavrooudis*, 86 Wash.App.at 30-32, 935 P.2d at 688-89; *cf. Hue v.*

08  *Farmboy Spray Co., Inc.*, 127 Wash.2d 67, 91 & n.22, 896 P.2d 682, 695 & n.22 (1995).

09  Indeed, there exists a genuine issue of material fact regarding whether *any* post-1993 exposure

10  could have caused Mr. Headley's silicosis.  Dr. Smith's explains in his declaration that, given

11  the twenty-year latency period of silicosis, Mr. Headley's exposure to A.O. Smith's silica-

12  containing product, which began eleven years before his 2004 silicosis diagnosis, could not

13  have caused the disease.  *See* Dkt. No. 76 at 2, ¶ 4 (Smith Decl.).  Dr. Firestone's deposition

14  provides further support for this conclusion.  *See* Dkt. No. 79, Ex. 3 at 70-71 (Firestone Dep.)

15  (describing similar latency or "lagging" period and concluding that "the period of '96 to '05 .

16  . . would [therefore] not factor substantially into my assessment of causation of his condition").

17   Ferro attempts to settle this genuine issue by referring to the deposition of Dr. Hammar, but

18  his statements could reasonably be interpreted to support either side in this dispute.  *See* Dkt.

19  No. 81, Ex. 1 at 60-61 (noting that latency period for silicosis generally stretches "15 to 30

20  years," but acknowledging that outliers might exist and that an "acute" case might tend to the

21  lower range of that scale, or lower).  At best, defendant's position intensifies, rather than

22  dispels, the genuine dispute of material fact on this issue.

23

24

25          [6] This argument was extended by defendant's counsel during oral argument in this case,
26  wherein counsel concluded, in answer to the Court's questioning, that if an employer such as A.O.
    Smith fails to perform an industrial hygiene survey, no employee plaintiff could ever recover under
    the substantial factor test.

SUMMARY JUDGMENT ORDER
PAGE – 11

01        The Court also disagrees with Ferro's second argument.   While Ferro is correct that

02   no industrial hygiene surveys were conducted at A.O. Smith from 1976 through 1993, the

03   record contains studies and other data which allow industrial hygiene experts to estimate

04   exposure for the time period in question in this case.  In March 2000, an industrial hygiene

05   consultant, Schumacher & Associates, conducted a survey of A.O. Smith's Renton facility

06   (where Mr. Headley worked) and issued a comprehensive report (the "Schumacher Report").

07   *See* Dkt. No. 67, Ex. 8.  These measurements were taken when Mr. Headley was using a

08   porcelain enamel mixture containing approximately 20% crystalline silica manufactured by

09   A.O. Smith.  *See id.* Ex. 9 at 149 (Firestone Decl. Addendum); Dkt. No. 66 at 14, n.12.

10        For purposes of this motion, Ferro does not dispute that Mr. Headley performed the

11   same job in 2000 that he did in earlier years, and plaintiffs have further provided evidence of

12   the similarity between the Seattle and Renton plants regarding such things as the overspray

13   cloud common to Mr. Headley's daily spraying routine.  *See, e.g.*, Dkt. No. 79, Ex. 3 at 11-13,

14   16 (Dr. Firestone Dep.).[7]  To make conclusions regarding exposure levels and causation in *this*

15   case, plaintiffs' experts have utilized the objective hygiene data from the Schumacher Report to

16   estimate Mr. Headley's exposure to a portion (10%) of the same type of particulates at an

17   earlier time—specifically, his 1976 to 1995 exposure to Ferro's product.  *See* Dkt. No.77 at 3,

18   ¶ 6 (Dr. Rose Decl.) (concluding that exposure to airborne respirable crystalline silica between

19   0.27 and .40 mg/m$^3$, "well in excess of the WISHA and NIOSH exposure levels of 0.10 and

20   0.05 mg/m$^3$"), *and* Dkt. No. 67, Ex. 3 at 149-50 (Dr. Firestone Decl. Addendum) (similar;

21   noting 0.41 mg/m$^3$, an exposure level for 1976 to 1995, exceeding the OSHA PEL).

22        Not only is there expert testimony in the record supporting this methodology as

23   commonplace in the industrial hygiene profession, see Dkt. No. 79, Ex. 2 at 162-63 (Rose

24   Dep.), but defendant's *own expert* used this analysis to conclude, favorable to the defendant,

25   _____

26        [7]  Indeed, Dr. Firestone opines that Mr. Headley's exposure to silica was *higher* in Seattle
     than it was in Renton, where he began wearing a "half face respirator."  *See* Dkt. No. 79, Ex. 3
     at 11-12, 15-16 (Dr. Firestone Dep.).

SUMMARY JUDGMENT ORDER
PAGE – 12

that Mr. Headley's 1976-1995 exposure to the Ferro product was within normal limits and thus not a substantial factor in causing his silicosis.  *See* Dkt. No. 64 at 7, ¶ h (Dr. Rock Decl.) calculating much lower level of exposure "while spraying the Ferro product," i.e., between $0.017$ mg/m$^3$ and $0.081$ mg/m$^3$).  Defendant's expert concluded that such "reasoning by analogy with breathing zone data collected in a different facility while Headley was spraying with a different product supports the hypothesis that his time weighted average exposures during his use of the Ferro product did not exceed the more conservative [TLV] or the even more conservative [recommended exposure limit]." *Id.* at 2; *but see* Dkt. No. 77 at 2-3 (Dr. Rose Decl.) (attacking Dr. Rock's conclusions).  The unsurprising fact that Dr. Rock came to a different conclusion than that of plaintiff s' experts is of no moment for summary judgment purposes.  More probative at this juncture is Dr. Rock's willingness to engage in the same expert methodology to analyze and quantify Mr. Headley's exposure to Ferro's silica-containing product.

In sum, this evidence, when viewed in a light most favorable to the plaintiffs, establishes genuine issues for trial on the issue of whether Mr. Headley's exposure to Ferro's product was a substantial factor in causing his silicosis.  As a result, proximate cause becomes a jury question unless there is no genuine issue of material fact that certain conduct by A.O. Smith constitutes a superceding cause.  *See Sharbono v. Universal Underwriters Ins. Co.*, 139 Wash.App. 383, 421, 161 P.3d 406, 426 (2007) ("[T]he substantial factor test is an appropriate method to determine proximate cause when the causation question requires the jury to consider not only what occurred but also what might have occurred.") (citing *Herskovits v. Group Health Coop.*, 99 Wash.2d 609, 617, 664 P.2d 474 (1983)).

        2.    *Genuine Issues of Material Fact Exists as to Ferro's Failure to Warn and/or Inadequate Warnings*

Washington's product liability statute provides that "[a] product manufacturer is subject to liability to a claimant if the claimant's harm was proximately caused by the

01  negligence of the manufacturer in that the product was not reasonably safe as designed."

02  R.C.W. § 7.72.030(1).  A product is "not reasonably safe" if it lacks adequate warnings. *Id.* §

03  7.72.030(1)(b).  To succeed on such a claim, "the plaintiff must prove that his . . . injuries were

04  proximately caused by [the] product" alleged to be unsafe.  *Soproni v. Polygon Apt. Partners*,

05  137 Wash.2d 319, 325, 971 P.2d 500, 504 (1999) (citing R.C.W. § 7.72.030(1)).  Ferro

06  insists that summary judgment be granted on plaintiffs' inadequate warnings claim for a want

07  of proximate causation on two independent grounds: (1) there being no evidence that any other

08  warnings, if provided to A.O. Smith, would have been considered and heeded by A.O. Smith

09  or Mr. Headley; and (2) that A.O. Smith's failure to meet its duty to train, warn, and protect

10  its employees as required by the "Sophisticated User Doctrine" constitutes a superceding

11  cause.  Dkt. No. 66 at 16-22.

12       The Court rejects both arguments.  First, genuine issues of material fact abound

13  regarding whether A.O. Smith and Mr. Headley did heed Ferro's warnings and would have

14  heeded additional, more adequate warnings had they been provided by Ferro.  The 1985

15  material safety data sheets ("MSDSs") referenced by Ferro mentioned the existence, effects,

16  and consequences of "silicate dust."  Dkt. No. 79, Ex. 13 at 202 (Nov. 13, 1985 MSDS).  The

17  far more harmful product of crystalline *silica* was never mentioned.   Plaintiffs' expert, Dr.

18  Rose, has offered detailed explanations as to the deficiencies in and misleading nature of this

19  and other of Ferro's MSDSs in the 1980s as well as the warning label affixed to its product

20  bags during the 1970s and 1990s. Dkt. No. 79, Ex. 6 at 6-11 (Dr. Rose Report); *see also id.*

21  Ex. 3 at 3-6 (Dr. Karnes Report) (similar).

22       Ferro does not attack these opinions, but instead contends that this evidence is

23  irrelevant because it is undisputed that "no one from A.O. Smith read or relied on Ferro's

24  MSDS while Ferro's product was in use." Dkt. No. 80 at 5 n.7.  Contrary to Ferro's

25  contention, however, there *is* evidence in the record that certain of these MSDS sheets were

26  read, considered and acted upon by A.O. Smith and Mr. Headley.  One such example involves

01  a November 1985 MSDS which stated that Ferro's Product Number 2772-2 did not contain

02  cobalt.  *See* Dkt. No. 79, Ex. 7.  Four years later, on July 26, 1989, Ferro sent A.O. Smith an

03  MSDS indicating that this product *did* contain cobalt.  *See id.* Ex. 8 at 5.  Less than one month

04  later, due to concerns raised by A.O. Smith and certain of its employees, the company sent

05  several of its Seattle-based employees to Dr. John Holland at Virginia Mason Hospital to

06  conduct laboratory work and quantitative analysis for "possible overexposure to cobalt at your

07  workplace, A.O. Smith."  *Id.* Ex. 9. (Dr. Holland Letter of Oct. 26, 1989).  Mr. Headley was

08  one of these employees.  *See id.* (letter to Mr. Headley regarding results of his examination),

09  *and* Ex. 10 at 54-55 (Hunt Dep.) (stating, as A.O. Smith Seattle supervisor, that a discussion

10  of the MSDS is what led to the cobalt concerns and subsequent laboratory testing).

11      Furthermore, defendant's argument regarding statements made in Mr. Headley's

12  deposition testimony and subsequent declaration does not resolve what is otherwise a genuine

13  issue of material fact on whether Mr. Headley would have heeded any additional warnings.

14  The same materials, which must be viewed in a light most favorable to the plaintiffs, establish

15  Mr. Headley's understanding from Ferro's warnings[8] that "I should wear my dust mask or

16  respirator when I was spraying or being around a lot of the dust so I wouldn't breathe it in,"

17  Dkt. No. 67, Ex. 2 at 209-10, and include the statements of Mr. Headley's supervisor that he

18  never saw Mr. Headley spray without a mask or respirator and regarded him as "one of the

19  more careful guys that I've ever had in that area."  *Id.* Ex. 10 at 34-35 (Hunt. Dep.).

20  Moreover, despite the conclusions of plaintiffs' experts regarding the deficient and/or

21  misleading warnings affixed to Ferro's product in this case, Ferro failed to ask Mr. Headley

22  during his deposition what he would have done had the warnings contained the additional

23  information plaintiffs' experts deemed necessary (for example, that silica dust could remain in

24

25      [8]  According to the plaintiffs, this warning stated:  "Caution, this product may contain

26  siliceous or toxic material, for manufacturing use only, do not make dust, inhale dust, fumes or
vapors, permit prolonged contact with skin, permit to contaminate food or feedstuff."  Dkt. No.
79, Ex. 11 at 67-68 (Faust Dep.).

SUMMARY JUDGMENT ORDER
PAGE – 15

01 | the air for substantial periods of time in the absence of visible dust and that a respirator should

02 | be worn in these circumstances).  *See, e.g.*, Dkt. No. 77 at 2-4, ¶¶ 4-7 (Rose Decl.); *see also*

03 | Dkt. No. 78 at 1, ¶ 2 (Headley Decl.) ("I did not understand after reading the warning that I

04 | should wear my dust mask or respirator after I mixed [and sprayed] the product, [when] I

05 | could see little, if any, dust in the air.").  Mr. Headley's declaration answers this question by

06 | stating that, were such information given, he would have worn the dust mask/respirator for the

07 | entire day, rather than the usual five hours per day he usually wore it.  Dkt. No. 78 at 2, ¶ 3

08 | (Headley Decl.).  At the very least, genuine factual disputes exist regarding whether Mr.

09 | Headley knew, or was ever made properly aware by Ferro, that breathing silica was possible

10 | even when the air appeared clear, as well as whether a warning indicating as much would have

11 | affected his safety decisions.  *See, e.g.*, *Ayers v. Johnson & Johnson Baby Prods. Co.*, 117

12 | Wash.2d 747, 755-756, 818 P.2d 1337, 1341 (1991) (holding that plaintiffs' contention "that

13 | had they been warned of the dangers of aspirating baby oil, the accident would have been

14 | avoided" satisfied the requirements of R.C.W. § 7.72.030(1)(b)).

15 |

16 | 3.    *Summary Judgment Is Improper on the Sophisticated User Doctrine and the Issue of Superceding Cause*

17 | Ferro's second causation argument attempts to shift the burden of warning those

18 | exposed to silica to A.O. Smith, which it contends failed miserably in this role by neglecting  to

19 | properly train, supervise, and care for its employees.  *See* Dkt. No. 66 at 19-22.  As a matter of

20 | law, Ferro argues that the "Sophisticated User Doctrine" provides that a manufacturer "has no

21 | duty to warn users when it supplies its product to a user who knows or reasonably should

22 | know of a product's dangers."  Dkt. No. 66 at 19 n.17 (citing *Humble Sand & Gravel, Inc. v.*

23 | *Gomez*, 146 S.W.3d 170 (Tex. 2004); *Smith v. Walter C. Best, Inc.*, 927 F.2d 736 (3rd Cir.

24 | 1990); *Goodbar v. Whitehead Bros.*, 591 F. Supp. 552 (W.D. Va. 1984).  This analysis

25 | effectively treats A.O. Smith as a superceding cause, particularly when considering the Court's

26 |

SUMMARY JUDGMENT ORDER
PAGE – 16

01  above rulings on summary judgment.[9]

02      Ferro has not cited, and this Court cannot find, a single Washington case adopting or

03  applying the Sophisticated User Doctrine.  During oral argument in this matter, counsel for

04  Ferro conceded that the doctrine has not been formally adopted by any Washington court.[10]

05  As a general matter, Washington law provides that a manufacturer "has a duty to warn the

06  ultimate user of any dangers in its product (other than those that are open or obvious)."

07  *Minert v. Harsco Corp.*, 26 Wash.App. 867, 875, 614 P.2d 686, 691 (1980).  "This duty is

08  non-delegable." *Id.*

09      In *Campbell v. ITE Imperial Corporation*, 107 Wash.2d 807, 733 P.2d 969 (1987), an

10  employee of public utility district ("PUD") brought an action against a manufacturer of an

11  electrical switchgear for injuries he sustained while working on auxiliary bushings that should

12  have been de-energized.  The question presented to the Washington Supreme Court was

13  "whether the negligence of appellant's employer in failing to warn of or protect appellant from

14  respondent's allegedly unsafe product constitutes an intervening act legally sufficient to

---

16  [9]  A defendant's conduct is not a proximate cause of the harm if, although it otherwise
17  might have been a proximate cause, a superseding cause intervenes.  A superseding cause is "an
    act of a third person or other force which by its intervention prevents the actor from being liable
18  for harm to another which his antecedent negligence is a substantial factor in bringing about."
    *Restatement (Second) of Torts* § 440 (1965); *Campbell v. ITE Imperial Corp.*, 107 Wash.2d 807,
19  812, 733 P.2d 969, 972 (1987).  "[O]nly intervening acts which are not reasonably foreseeable are
    deemed superseding causes." *Anderson v. Dreis & Krump Mfg. Corp.*, 48 Wash.App. 432, 442,
20  739 P.2d 1177, 1184 (1987).  "A superseding cause exists if the acts of the plaintiff or a third
    party are so highly extraordinary or unexpected that [they] can be said to fall without the realm
21  of reasonable foreseeability as a matter of law." *Cramer v. Dep't of Highways*, 73 Wash.App. 516,
22  521, 870 P.2d 999, 1001 (1994) (quotation omitted) (alteration by *Cramer* court).

23  [10]  Counsel for Ferro also analogizes this doctrine to the "learned intermediary rule"
    adopted by the Washington Supreme Court in *Terhune v. A.H. Robins Co.*, 90 Wash. 9, 577 P.2d
24  975 (1978).  This rule, however, appears to be limited to cases involving the relationship between
    a drug manufacturer, a prescribing physician and his or her patient, and is therefore not a proper
25  fit for this case.  *See, e.g.*, *Washington State Physicians Ins. Exch. & Ass'n v. Fisons Corp.*, 122
    Wash.2d 299, 313, 858 P.2d 1054, 1061 (1993).  In this "unique relationship," the physician
26  "stands in the shoes of the 'ordinary consumer' of the drug" and is therefore "the logical person
    to be the 'private attorney general' under RCW 19.86.090." *Id.* (footnotes omitted).

SUMMARY JUDGMENT ORDER
PAGE – 17

01  operate as a superseding cause." *Id.* at 808, 733 P.2d at 970. The court held that the trial

02  court erred in giving a superseding cause instruction, and therefore reversed and remanded the

03  case for a new trial. *Id.* Before doing so, however, the court reiterated the abovementioned

04  general causation principles by stating as follows:

05         The manufacturer bears responsibility for affixing an adequate warning to its
           product, *see Teagle v. Fischer & Porter Co.*, 89 Wash.2d 149, 155, 570 P.2d
06         438 (1977), and this duty generally is not delegable. *Minert v. Harsco Corp.*,
           26 Wash.App. 867, 874, 614 P.2d 686 (1980). Thus, it would be anomalous to
07         hold that an employer's failure to warn constituted a superseding cause.

08  *Id.* at 814, 733 P.2d at 973

09         The court concluded its analysis with the following substantive outline, applicable to

10  both negligence and strict products liability theories:

11         In sum, we hold that an employer's failure to warn or protect an employee from
           a product which is unreasonably unsafe, unless accompanied by a warning, does
12         not constitute a superseding cause, unless (1) the employer's intervening
           negligence created a different type of harm; or (2) the employer's intervening
13         negligence operated independently of the danger created by the manufacturer;
           or (3) the employer had actual, specific knowledge that the product was
14         unreasonably unsafe and failed to warn or protect. Because there is no such
           evidence in the record of this case, the trial court erred in giving a superseding
15         cause instruction.

16  *Id.* at 817, 733 P.2d at 974-75.

17         In the present case, no evidence or argument has been presented that Mr. Headley's

18  injury was not foreseeable to Ferro, or that his injury was produced by a different type of harm

19  or operated independently from the danger created by his various repetitive exposures to

20  Ferro's silica-containing product. Furthermore, the final element discussed in *Campbell*, the

21  employer's knowledge and failure to act, cannot be decided on summary judgment due to

22  disputed material facts discussed above regarding Ferro's inaccurate and inadequate warnings

23  and A.O. Smith's attempts and successes in warning and protecting its employees. *See supra* §

24  VI.B.2. Summary judgment is therefore inappropriate on the issue of a superceding cause.

25             4.    *Summary Judgment is Proper on Plaintiffs' Misrepresentation Claim*

26         Ferro has also moved for summary adjudication on plaintiffs' misrepresentation claim.

SUMMARY JUDGMENT ORDER
PAGE – 18

01  Dkt. No. 66 at 22 n.21.  Plaintiffs have not opposed this motion and indeed conceded this issue

02  during oral argument in this matter.  Accordingly, defendant's motion for summary judgment is

03  granted with regard this claim.

04

05           5.     *Further Briefing is Directed on Plaintiffs' Defective and Negligent Design and Breach of Warranty Claims*

06       Ferro moved for summary judgment on these claims in a footnote.  Dkt. No. 66 at 22

07  n.21.  Plaintiffs responded with three paragraphs that reference one statement and two

08  deposition words by plaintiffs' expert, Dr. Clifton Bergeron.  Dkt. No. 75 at 23.  Ferro's reply

09  concludes that plaintiffs have failed to establish a defective design claim under either the risk-

10  utility test or the consumer expectations test.  Dkt. No. 80 at 8.

11       The state of the record does not permit the Court to rule on these issues at this time.

12  The arguments of the parties, as well as the attached snippets of Dr. Bergeron's deposition and

13  declaration, do not provide the Court with sufficient information to determine the applicability

14  of the risk-utility or consumer expectations test and prevent the Court from applying Dr.

15  Bergeron's conclusions to the facts in this case.  Moreover, it is not clear from the limited

16  material that was submitted whether Dr. Bergeron knows the A.O. Smith product line, or

17  whether Dr. Bergeron was aware that the A.O. Smith product line included silica-containing

18  products.

19       Accordingly, the parties are DIRECTED to file briefs addressing these issues **not**

20  **longer than ten (10) pages** in length **by not later than Wednesday, May 28, 2008**.  Any

21  limited additional portions of Dr. Bergeron's <u>deposition</u> testimony necessary to establish a

22  foundation can be submitted as an appendix that will not be included as part of the page

23  limitations.  No opposition briefs shall be submitted.  This briefing should also indicate whether

24  plaintiffs' claims for breach of warranty and other unaddressed claims remain in this case.  *See*

25  Dkt. No. 66 at 22 n.21.

26

SUMMARY JUDGMENT ORDER
PAGE – 19

01

VII.    CONCLUSION

02          For the foregoing reasons, defendant Ferro Corporation's Motion to Strike (Dkt. No.

03    81) is DENIED, and its Motion for Summary Judgment (Dkt. Nos. 62, 66) is GRANTED IN

04    PART AND DENIED IN PART, for the reasons stated by the Court.  Further briefing is also

05    directed as indicated by the Court.  The Clerk of Court is directed to send a copy of this Order

06    to the parties of record.

07          DATED this 22nd day of May, 2008.

08

09                                                _James P. Donohue_____

10                                                JAMES P. DONOHUE
                                                  United States Magistrate Judge

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

SUMMARY JUDGMENT ORDER
PAGE – 20